UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TASHA N. GARDNER,

    Ms. Gardner,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Case No. 3:24-CV-817 JD

## **OPINION AND ORDER**

Plaintiff Tasha Gardner appeals the denial of her claims for disability insurance benefits under Title II of the Social Security Act. For the reasons below, the Court will remand this case to the Agency for additional consideration.

### A.  Standard of Review

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the

claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Still, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant and the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

## B.  Standard for Disability

Disability benefits are available only to those individuals who can establish disability under the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). The claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform past relevant work; and

5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

### C. Procedural Background

Ms. Gardner protectively applied for disability insurance benefits in January 2015, alleging a disability beginning on April 4, 2014 (R. at 173–74). The application was denied initially and on reconsideration (R. at 96, 110). Since then, Ms. Gardner has had three administrative hearings on her claim (April 2017: R. 37-63, duplicated at R. at 824–50; August 2020: R. 738–82, duplicated at R. 1712–56; and June 2022: R. at 1521–76), each resulting in administrative disability denial (September 2017: R. at 19–36, duplicated at R. at 783–800; November 2020: R. at 711–37, duplicated at R. at 1621–47; and October 2022: R. at 1676–1704). Ms. Gardner has twice appealed in the district court, with the court vacating and remanding to the Agency for further administrative proceedings. (R. at 807–19, 1655–57).

In November 2022, Ms. Gardner filed written exceptions to the ALJ's October 2022 decision denying her claim (R. at 1862–85). On June 30, 2023, the Appeals Council assumed jurisdiction of the case under 20 C.F.R. § 404.984, vacated the prior decision, and remanded the case to an ALJ to resolve issues regarding the weighing of medical opinions, the claimant's residual functional capacity, and the vocational evidence used to identify jobs that accommodate the claimant's work limitations (R. at 1705–11).

After a hearing on May 22, 2024 (Tr. 1577–1620), ALJ Stephanie Katich denied Ms. Gardner's disability insurance benefits on June 14, 2024, finding that Ms. Gardner retained the capacity to perform a range of light work during the relevant insured period between April 4, 2014, and June 30, 2017. (R. at 1466–87). Ms. Gardner did not file written exceptions to the ALJ's decision, and the Appeals Council declined to assume jurisdiction within 60 days of the ALJ's decision. Thus, the ALJ's decision is the final decision of the Commissioner, subject to

judicial review under 42 U.S.C. § 405(g).[1] *See* 20 C.F.R. § 404.984 (establishing procedures for federal courts in remanded cases).

## D. The ALJ's Decision

In finding that Ms. Gardner was not disabled, the ALJ employed the customary five-step analysis. At step two, she found that Ms. Gardner suffered from the following severe impairments:

> hypothyroidism status-post thyroidectomy (post ablative secondary to Graves' disease), type 2 diabetes mellitus, occipital neuralgia, bilateral trochanteric bursitis, mild anterior wedging of T11, cervical and lumbar facet arthropathy, radiculopathy, chronic pain syndrome, obesity, generalized anxiety disorder, posttraumatic stress disorder (PTSD), and mood/depressive disorder.

(ALJ's Decision, R. at 1469 (citations to the record omitted).) At step three, the ALJ concluded that Ms. Gardner "does not have an impairment or impairments or combination of impairments that meets or medically equals the severity of [a Listing]." (*Id*. at 1470.)

In her decision, the ALJ recounted Ms. Gardner's testimony at the hearing. The ALJ noted that Ms. Gardner testified about the impact of her mental impairments, including anxiety and panic attacks, on her ability to work during the relevant period. (*Id*. at 1479.) Ms. Gardner described working with her parents in a family-owned business and becoming flustered and unable to think when more people were in the office, leading her to lock herself in the bathroom. (*Id*. at 1479–80.) She reported feeling overwhelmed, losing focus, and experiencing symptoms of

---

[1] While the Title II claim was awaiting a decision following remand, a different ALJ held a hearing on July 14, 2022, concerning an application Ms. Gardner filed on August 17, 2020, for Supplemental Security Income benefits under Title XVI (R. at 1668). On July 26, 2022, the ALJ issued a fully favorable decision finding that Ms. Gardner had been disabled since August 17, 2020, the date of her Title XVI application. (R. at 1663–75).

5

panic such as shaking, heart racing, and difficulty thinking clearly. (*Id*. at 1480.) Ms. Gardner said she was irritable, sad, and needed to be alone, often going to her parents' house to lie down during work hours. Ms. Gardner described difficulty with grocery shopping, sometimes leaving her cart and exiting the store due to being overwhelmed by the number of people in the store. (*Id*. at 1480.)

The ALJ also considered Ms. Gardner's testimony at the previous hearings in 2017 and 2020. Back then, Ms. Gardner testified experiencing daily fatigue, difficulty getting out of bed, and needing to alternate positions because of pain. She stated that sitting was particularly painful for her back, requiring her to lie down frequently and shift positions every 10–15 minutes. Ms. Gardner said that she could not stand in one spot for long and struggled to get up after sitting, sometimes taking 15 minutes to reach the bathroom due to foot pain. She testified about needing to lie down during the day to relieve pain, using medication and a heating pad, and often leaving work early because of pain. (*Id*. at 1478.) Regarding mental health, she reported PTSD, depression, and anxiety, saying she sometimes needed to escape to the bathroom at work to avoid people. Ms. Gardner described working at a concession stand for her daughter's school, which left her tired and in pain the next day. Finally, she said she used a cane one to two days a week and experienced frequent headaches which she attributed to high blood sugar. (*Id*. at 1478–79.)

In her decision, the ALJ agreed that Ms. Gardner's medical condition could cause the symptoms she described. Even so, she concluded that her statements about the severity, persistence, and limiting effects of those symptoms were not fully consistent with the medical and other evidence in the record.

The ALJ also considered the medical opinions and prior administrative medical findings. She found the opinion of the medical expert David Peterson, Ph.D., to be especially persuasive. Dr. Peterson testified at the hearing on May 22, 2024, and the ALJ accorded his opinion "great weight." (*Id*. at 1481.) Dr. Peterson emphasized that during the relevant period, Ms. Gardner's primary issues were physical, and while anxiety was mentioned in the medical records, it did not affect her functioning. He opined that she had no more than moderate psychiatric limitations at that time, with no issues in adaptation or self-management, citing her statements to Dr. Heath Fervida that her disability claim was based on physical impairments and that her mental health did not interfere with daily functioning. (*Id*. at 1481 (citing Exhibit B4F).)

The ALJ noted that Dr. Peterson found no reason to limit Ms. Gardner to simple and repetitive tasks or detailed, complex tasks, but advised against fast-paced work. When asked about the state agency physicians' opinions that Ms. Gardner would have difficulty working a full workday or workweek, "Dr. Peterson opined there was no psychiatric reason for this limitation during the relevant period." (*Id*. at 1483.) Dr. Peterson did state that Ms. Gardner's "physical impairments combined with her mental impairments would affect her persistence in the form of additional absences for medical appointments," although, according to the ALJ, Dr. Peterson "reiterated that he is not a physical medicine doctor."[2]

Again, the ALJ gave "great weight" to Dr. Peterson's opinion, noting that although he was not a treating provider, he reviewed the full record and testified in detail about his conclusions. According to the ALJ, Dr. Peterson's opinion focused on the 2014–2017 period;

---

[2] In response to Ms. Gardner's attorney's question, Dr. Peterson testified that, based "on the whole review," Ms. Gardner would likely be absent at least two days a month as a result of her physical and mental impairments combined. (R. at 1610–11.)

7

was based on the longitudinal treatment history, Ms. Gardner's statements, and provider observations; and was consistent with both treating and consultative sources.

On the other hand, the ALJ was not persuaded by the opinion of Ms. Gardner's treating physician Dr. Nicholas Finley to which she accorded "little weight." (*Id*. at 1484.) Dr. Finley has been Ms. Gardner's physician since May 2021 (nearly four years after the date last insured). In August 2022, he provided a Medical Assessment Questionnaire. In the questionnaire, Dr. Finley endorsed the 2015 opinion of consultative examiner Dr. Sasikala Vemulapalli and reported limitations such as the need to alternate positions, difficulty concentrating, and potential absences from work. However, the ALJ found Dr. Finley's opinion to be largely based on Ms. Gardner's subjective reports rather than objective evidence. The ALJ observed that Dr. Finley did not treat Ms. Gardner during the relevant period, and found his opinion to be inconsistent with contemporaneous records from her prior physician, Dr. Gary Pitts. (*Id*. at 1483.)

The ALJ also gave "little weight . . . to the [June 8, 2015] opinion of the internal medicine consultant examiner, Dr. Vemulapalli, M.D." (*Id*. at 1483.) "Dr. Vemulapalli concluded [Ms. Gardner] would have difficulty maintaining focus and concentration, that she would be unable to stand or walk at least two hours in an eight-hour day . . . [and that she] must alternate sitting and standing occasionally . . . ." (*Id*.) While the ALJ adopted the latter limitation, she found the rest of Dr. Vemulapalli's findings unsupported "by other evidence in the record or Dr. Vemulapalli's own clinical observations." (*Id*.) Instead, according to the ALJ, Dr. Vemulapalli appeared to base some limitations on Ms. Gardner's subjective complaints rather than objective findings, and the broader medical record does not support the greater limitations he described. (*Id*.)

8

The ALJ concluded that, from April 4, 2014, through June 30, 2017, Ms. Gardner had the residual functional capacity ("RFC")[3]

> to perform light work[4]. . . except that [she] could occasionally climb ramps and stairs, but could never climb ladders, ropes, scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl. [Ms. Gardner] should have avoided all exposure to unguarded moving machinery, unprotected heights, wet, slippery or uneven surfaces, operation of foot controls. She should have avoided concentrated exposure to extreme heat, extreme cold, humidity, bright outdoor lighting, and she needed to occasionally alternate sitting and standing. In addition, [Ms. Gardner] should have avoided work activity requiring contact with the general public, she could respond appropriately to occasional interactions with coworkers and supervisors, with a focus on working with things, rather than people, and no fast-paced work activities, such as assembly line type work activity.

(*Id*. at 1473.)

The ALJ posed a hypothetical question to the vocational expert ("VE") based on her RFC findings. The VE testified that there were jobs in the national economy in significant numbers that a hypothetical person with Ms. Gardner's RFC could perform: electrical product inspector, inspector hand packager, and small products assembly. (R. at 1486.) The VE also testified that, although it depends on each employer, in the VE's experience, the employers tolerate "between one to two absences . . . per month, but no more than that" . . . , "up to 24 absences per year." (Hearing Tr., R. at 1616–17.) Further, if "the individual was absent . . . one day a week or needed

---

[3] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

to arrive late to work or to leave early from work . . . at least once a week," that would be work preclusive. (*Id.* R. 1617.)

Once the ALJ finished questioning the VE, Ms. Gardner's attorney asked a series of questions about the VE's methodology for determining the number of jobs available in the national economy. However, before the attorney could complete the cross-examination, the ALJ interrupted, stating that she was going off the record because she had another hearing (*Id*. at 1619). The entire hearing lasted one hour and seventeen minutes. (*Id*. at 1579, 1620.) The ALJ accepted the VE's testimony, ultimately finding that Ms. Gardner was not disabled. (R. at 33–34.)

**D.  Discussion**

Ms. Gardner raises three main arguments. First, she contends that the ALJ failed to consider that the consultative examiner, Dr. Vemulapalli, rendered an opinion that Ms. Gardner was incapable even of sedentary work, and that this opinion was consistent with other medical opinions in the record. In the same vein, she argues that the ALJ erroneously failed to accord controlling weight to the opinion of her treating physician, Dr. Finley. Alternatively, she submits that even if Dr. Finley's opinion was not entitled to controlling weight, the ALJ failed to evaluate it under the regulatory factors in 20 C.F.R. § 404.1527(c). In this context, Ms. Gardner also argues that the ALJ erred by selectively crediting Dr. Peterson's opinion, giving it "great weight" for mental functioning, while failing to address his testimony that Ms. Gardner's combined impairments would likely cause work-preclusive absenteeism.

Second, Ms. Gardner maintains that the ALJ failed to properly assess her subjective symptom complaints.

Finally, she asserts that the ALJ violated her due process rights by interrupting her attorney before the attorney could finish cross-examining the VE.

### (1) *Medical Opinions*

The Court starts its discussion with the medical opinions of Drs. Vemulapalli, Finley, and Peterson.

Disability cases typically involve three types of physicians: 1) a treating physician who regularly provides care to the claimant; 2) an examining physician who conducts a one-time physical exam of the claimant; and 3) a reviewing or non-examining physician who has never examined the claimant, but read the claimant's files to provide guidance to an adjudicator. *See Giles v. Astrue*, 433 Fed. Appx. 241, 246 (5th Cir. 2011). When this case was filed, the opinion of the first type, a "treating physician," was ordinarily afforded special deference in disability proceedings:[5]

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion was not entitled to controlling weight, however—such as where it was unsupported by the objective medical evidence, where it

---

[5] The applicable regulations have since been amended, but those amendments do not apply here because Ms. Gardner filed her claim before March 27, 2017. 20 C.F.R. § 404.1520c.

was inconsistent with other substantial evidence in the record, or where it was internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995))—then the ALJ should have moved on to assessing the opinion in the same way she would have any other medical evidence. *See* 20 C.F.R. § 404.1527(c)(2).

Assessing the value of the opinion depends on a number of factors, such as the examining relationship (with more weight given to an opinion of an examining source); the treatment relationship, which includes the length, frequency, and nature of the treatment; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the opinion. 20 C.F.R. § 404.1527(c); *Elder*, 529 F.3d at 415. If the ALJ discounts the treating physician's opinion after considering these factors, her decision must stand as long as she "minimally articulated [her] reasons—a very deferential standard that we have, in fact, deemed lax." *Elder*, 529 F.3d at 415 (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)). Still, the ALJ must offer "good reasons" for discounting a treating physician's opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Likewise, while "[a]s a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence . . . rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014)

Dr. Vemulapalli examined Ms. Gardner in June 2015 and provided an opinion about her functional limitations. (R. 389–93.) He stated that Ms. Gardner "will have difficulty maintaining focus and concentration," "is unable to stand/walk at least 2 hours in an 8 hour day," and "must

alternate sitting and standing occasionally." (R. at 391.) Although the ALJ incorporated a

sit/stand option in the RFC, she found that the "balance of the more extreme limitations are not

supported by other evidence in the record or Dr. Vemulapalli's own observations." The ALJ

further indicated that it "appears" Dr. Vemulapalli based his opinion on Ms. Gardner's

"subjective complaints rather than his actual examination findings." (ALJ's Decision, R. at

1483.) The ALJ also concluded that "pain management and other records do not support the

greater limitations described in the opinion of Dr. Vemulapalli." (*Id.*) In all, the ALJ assigned Dr.

Vemulapalli's opinion "little weight." (*Id.*)

       The Court finds no fault in the ALJ's assessment that Dr. Vemulapalli's opinion is not

supported by his own examination. His examination notes indicate that, although Ms. Gardner

has joint inflammation and there's tenderness in bilateral lower lumbar region, she has normal

tandem gait and standing, normal station, free range of motion in upper extremities, no joint

tenderness, and her extremity strength is normal or near normal. (R. at 390.) However, the ALJ's

analysis cannot end there. In determining the appropriate weight to assign a nontreating

physician's opinion, the ALJ must also evaluate the opinion's supportability, consistency with

the record, and the physician's specialization. 20 C.F.R. § 404.1527(d)(3)–(6) ("Regardless of its

source, we will evaluate every medical opinion we receive. Unless we give a treating source's

medical opinion controlling weight under paragraph (c)(2) of this section, we consider *all* of the

following factors in deciding the weight we give to any medical opinion: . . . supportability . . .

consistency . . . specialization . . . other factors . . . .") (emphasis added); *see also Simila v.

Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) ("[A]n ALJ is required to determine the weight a

nontreating physician's opinion deserves by examining how well Dr. Caillier supported and

explained his opinion, whether his opinion is consistent with the record, whether Dr. Caillier is a specialist in pain disorders, and any other factor of which the ALJ is aware.")

That said, the ALJ's assessment that Dr. Vemulapalli's opinion is inconsistent with other medical evidence in the record is flawed. According to the ALJ, Dr. Vemulapalli's opinion contradicts the Summit Pain Management records. But she provides not even a glimpse of what that inconsistency may be. Perhaps the ALJ was contemplating that Dr. Roth, who managed Ms. Gardner's pain, once "noted that [her] gait was stable, and she did not have any bowel/bladder or other neurological symptoms" (ALJ's Decision, R. at 1476), but even if so, the ALJ ignored her own findings that, during the relevant period, Ms. Gardner received pain management treatment for back pain, including radiofrequency ablation and nerve blocks, which provided some relief, but did not eliminate needing continued prescriptions of narcotic pain medication. (*Id.*) According to the ALJ, Ms. Gardner reported pain levels of 7/10, worsened by prolonged sitting or standing and relieved by medication and position changes. On examination, Dr. Roth found lumbar facet tenderness, pain with movement, and tenderness in the sacroiliac joints. In addition, Dr. Roth's diagnoses included cervical and lumbar facet arthropathy, lumbar and thoracic radiculopathy, occipital neuralgia, neuropathic pain, and iliotibial band syndrome. (*Id.*)

In fact, from August 2014 through June 2017, Ms. Gardner reported to Summit Pain Management providers twenty-one times, consistently complaining that prolonged sitting and standing, and occasionally walking worsened her pain, and that a change of position relieved it (R. at 353, 358, 363, 370, 375, 382, 403, 591, 594, 598, 601, 659, 665, 671, 673, 678, 683, 688, 694, 1163, and 1168.) The same records contain numerous positive straight leg raises, lumbar facet tenderness, lumbar pain with extension or flexion, sacroiliac tenderness, decreased muscle strength and sensation, and hip tenderness. Without the ALJ explaining what she believes is

14

inconsistent between Dr. Vemulapalli's opinion and the pain management records, the Court has no way of knowing what that contradiction may be and whether it's real.

Moreover, it's not enough for the ALJ to say that Dr. Vemulapalli's opinion is unsupported by the "other records." Such generalization made it impossible for the ALJ to provide good reasons for rejecting Dr. Vemulapalli's opinion, as required. The Court cannot find that the ALJ offered good reasons, supported by substantial evidence, for giving little weight to Dr. Vemulapalli's opinion. And because the ALJ's evaluation of Dr. Vemulapalli's opinion is erroneous, her conclusion regarding the weight of that opinion is not supported by substantial evidence.

Next, the Court considers the ALJ's evaluation of Dr. Finley's opinion. The Commissioner does not dispute that Dr. Finley is Ms. Gardner's treating physician. Instead, the Commissioner argues that the ALJ properly gave Dr. Finley's opinion little weight because Dr. Finley did not begin treating Ms. Gardner until May 2021, nearly four years after her insured status expired in 2017. (Def.'s Resp. Br., DE 21 at 17–18.)

The courts "typically expect an ALJ to consider an opinion by a doctor who treated the claimant after the relevant period if it offers a retrospective diagnosis that is corroborated by evidence produced during the relevant period." *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). If relevant, such an opinion is entitled to controlling weight under 20 C.F.R. § 404.1527(c)(2), unless the ALJ provides minimally articulated and supportable reasons for declining to give it that weight. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Astrue*, 390 F.3d 500, 503 (7th Cir. 2004).

As relevant to this appeal, like Dr. Vemulapalli, Dr. Finley opined that Ms. Gardner could not stand or walk at least 2 hours in an 8-hour work day. (R. at 2347.) In addition, Dr.

15

Finley believes that Ms. Gardner's impairments would likely cause her to miss work 1–6 days per month. (R. at 2349.) While the ALJ acknowledged and ultimately rejected these findings, her rationale suffers from the same flaws discussed above in connection with Dr. Vemulapalli's opinion. This is unsurprising, as Dr. Finley expressly relied on Dr. Vemulapalli's opinion. Moreover, the ALJ applied the same reasoning to both opinions. Accordingly, the Court need not conduct a separate analysis nor inquire whether the ALJ failed to accord controlling weight to Dr. Finley.

Next, the Court turns to Dr. Peterson, who testified as an expert regarding Ms. Gardner's mental impairments, and whose opinion the ALJ found to be of "great weight." (ALJ's Decision, R. at 1481, 1482.) Central to this appeal is Dr. Peterson's testimony that Ms. Gardner's numerous medical appointments and the demands of managing her symptoms and pain would have an impact on her persistence at work. Dr. Peterson reviewed the records from 2014 to 2017 and believed that there were no psychiatric reasons for Ms. Gardner's absenteeism from work. However, after qualifying that he is not a physical medicine doctor, Dr. Peterson stated that the combination of all of what Ms. Gardner is managing—"the physical and mental combined"— would likely result in Ms. Gardner being absent at least two days a month. (R. at 1610.) The ALJ recognized this testimony in her decision:

> When asked to opine on the number of breaks or absences the claimant might need secondary to her impairments, he reiterated that he is not a physical medicine doctor, but her physical impairments combined with her mental impairments would affect her persistence in the form of additional absences for medical appointments.

(ALJ's Decision, R. at 1482.)

But apart from this acknowledgment, the ALJ didn't explain what effect this opinion had on her overall decision. It therefore appears that the ALJ ignored evidence favorable to Ms.

16

Gardner and chose to discuss only evidence cutting against disability. Such cherry-picking is impermissible. *See Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (ALJ is not permitted to cherry-pick facts supporting his finding of disability and ignore evidence that point to disability). Despite Dr. Peterson's testimony about absenteeism, the ALJ did not include any limitations related to Ms. Gardner's ability to persist, nor did she explain why such a limitation was unwarranted. Although Dr. Peterson qualified his testimony by noting that he is not a physical medicine doctor, he did not disavow his opinion that Ms. Gardner would miss work at least two days per month. While it is the ALJ's role to weigh the evidence, she failed to do so here, effectively ignoring evidence favoring Ms. Gardner. The Court will not assume that the ALJ's mere restatement of Dr. Peterson's testimony constitutes a reasoned rejection of it.

### (2) *Ms. Gardner's Credibility*

An ALJ's subjective symptom analysis is given special deference so long as the ALJ explains her reasoning and it is supported by the record. The Court will not overturn an ALJ's subjective symptom analysis unless it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). The claimant bears the burden of demonstrating that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 F. App'x 16, 19–20 (7th Cir. 2018). The regulations require the ALJ to look at a variety of factors in evaluating a claimant's symptoms, including the nature and intensity of pain, the effects of her pain on her ability to function, and daily activities. 20 C.F.R. § 404.1529(c). When allegations of pain are considered, "the absence of objective medical corroboration for a complainant's subjective accounts of pain does not permit an ALJ to disregard those accounts. To the contrary, an ALJ 'must consider subjective

17

complaints of pain if a claimant has established a medically determined impairment that could reasonably be expected to produce the pain.'" *Ghiselli v. Colvin*, 837 F.3d 771, 777–78 (7th Cir. 2016) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014)).

In concluding that Ms. Gardner was exaggerating her limitations, the ALJ's errors in evaluating the medical opinions skewed the symptom evaluation as well. But the ALJ's analysis suffers from additional flaws. In discounting Ms. Gardner's complaints of pain, the ALJ found it important that she had no documentation of "signs typically associated with chronic severe pain such as muscle atrophy, spasm, rigidity, or tremor." (ALJ's Decision, R. at 1480.) In addition, according to the ALJ, "neurologic findings have not described any persistent motor or sensation abnormalities suggesting the need for greater restrictions than provided [in the RFC]." (*Id.*) The ALJ cited no opinion or medical authority for her assumption that medical evidence needed to demonstrate muscle atrophy, spasm, rigidity, or tremor to find consistency with chronic, severe pain. The ALJ also relied on her own medical speculation to conclude that findings of persistent motor or sensation abnormalities did not indicate the need for greater restrictions than the RFC she assessed for light work. In a word, when evaluating Ms. Gardner's testimony, the ALJ played doctor, which she may not do. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("The Commissioner's determination must be based on testimony and medical evidence in the record. And, as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ also erred in concluding that, given the absence of "significant objective findings," "the record does not support the severity of the symptoms or dysfunction alleged at the hearing." (ALJ's Decision, R. 1481.) With that statement, the ALJ effectively ended the inquiry into Ms. Gardner's pain allegations. Yet as noted above, an ALJ may not disregard a claimant's

subjective accounts of pain merely because they are not corroborated by objective medical evidence.

Granted, the ALJ considered the third-party function reports submitted by Ms. Gardner's mother and her friend, but ultimately gave them little weight. The ALJ noted that the mother's report emphasized Ms. Gardner's physical impairments but found it of limited probative value because she is an untrained layperson and may be predisposed to view her daughter's condition favorably:

> [Ms. Gardner's mother] is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency and intensity of unusual moods or mannerisms. Additionally, by virtue of their relationships with the claimant, the witness cannot be considered a disinterested third party, whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.

(ALJ's Decision, R. at 1484.) Apart from the "virtue of their relationship," the ALJ provided no reason why she believes that the mother's testimony cannot be truthful despite her relationship with her daughter.

The ALJ applied similar reasoning for discrediting Ms. Gardner's friend, Rhonda Hoskins, FNPBC:[6]

> Ms. Hoskins reported that she had no treating relationship with the claimant, but noted that as a friend, she had "watched her slowly decline physically." She further noted the claimant had reduced ability to do things socially, and had difficulty managing her diabetes mellitus. Ms. Hoskins' opinions are given little weight. While Ms. Hoskins' is medically trained, by virtue of her relationship with the claimant, the witness cannot be considered a disinterested third party, whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. Pursuant

---

[66] While not stated in the decision, presumably the letters stand for "Family Nurse Practitioner–Board Certified." *See* FNP-BC vs. FNP-C: What's the Difference? https://www.goodwin.edu/enews/fnp-bc-vs-fnp-c-differences/ (last visited October 14, 2025).

to 20 CFR 404.1520c(d), the undersigned is not required to articulate the requirements in paragraphs 20 CFR 404.1520c(a) through (c) and 416.920c when considering evidence from non-medical sources.

(*Id.*)

The ALJ's reasoning is flawed:

By definition, lay witnesses do not have medical training, but the regulations require ALJs to consider their statements. Social Security regulations provide that "[i]n addition to evidence from the acceptable medical sources . . . [ALJs] may also use evidence from other sources to show the severity of [a claimant's] impairments and how it affects [a claimant's] ability to work. Other sources include . . . nonmedical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)." 20 C.F.R. § 404.1513(d)(4); *see also* 20 C.F.R. § 404.1545(a)(3) (stating that "[w]e will consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.").

*Roque v. Colvin*, No. 15 C 392, 2016 WL 1161292, at *5 (N.D. Ill. Mar. 22, 2016).

What is more, assuming bias merely because of the relationship between the claimant and the witness undermines the very purpose of a third-party report, namely, to provide observations from someone who knows the claimant and can attest to her medical or mental condition. *See Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (noting that even a fiancée's third party function report should not be automatically discounted for potential bias).

In summary, the flawed subjective symptoms evaluation is yet another reason for overruling the ALJ.

### (3) *Cross-Examination*

Since the case is being remanded, the Court need not address Ms. Gardner's claim that her due process rights were violated when the ALJ ended the hearing even as Ms. Gardner's attorney was cross-examining the VE. It will suffice to say that to avoid any potential legal

issues, it is advisable for the ALJs to inform the attorneys how much time they have for cross-examination. *See Matthiscyk v. Bisignano*, No. 24-2488, 2025 WL 2835768, at *2 (7th Cir. Oct. 7, 2025). (although the ALJ did not abuse discretion in ending cross-examination where claimant's counsel had a reasonable opportunity to question the vocational expert about methodology and data sources, "[p]erhaps the ALJ would have been well advised to foreshadow time limitations so counsel could have planned accordingly").[7]

### (4) *Ms. Gardner's Request for Award of Benefits*

Ms. Gardner contends that her case should not be remanded; instead, she should be awarded benefits. She notes that more than ten years have passed since she applied for benefits, with multiple ALJs presiding and multiple VEs and psychological experts testifying. Ms. Gardner argues that the evidence is uncontroverted that she would be absent at least two days per month from any job, and that the combined limitation of standing or walking for less than 2 hours in a workday, along with the need to alternate sitting and standing occasionally, as opined by Dr. Vemulapalli, erodes both the light work and sedentary occupational bases. She contends

---

[7] Without deciding this issue, the Court also notes that, while the ALJ found obesity to be a severe impairment, its impact is addressed in a rather boilerplate fashion. (*See* ALJ's Decision, R. at 1471.) To avoid unnecessary litigation, on remand the ALJ should be mindful to consider the obesity as directed by Social Security Ruling, SSR 02-1p; Titles II and XVI: Evaluation of Obesity, 67 FR 57859-02, or otherwise ensure that it's accounted for beyond a boilerplate statement. *See, e.g.*, *Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013) ("We agree with [the plaintiff] that the ALJ did not specifically [discuss any functional limitations resulting from the obesity when formulating his RFC assessment.] We have held, however, that this type of error may be harmless when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor to the exacerbation of other impairments.").

that remand would be "a futile exercise which would unnecessarily prolong the correct resolution of this case, since the uncontradicted evidence compels an award of benefits." (Pl.'s Rep. Br., DE 22 at 11–12.)

A direct award of benefits is only warranted "'if all factual issues have been resolved and the record supports a finding of disability.'" *Israel v. Colvin*, 840 F.3d 432, 442 (7th Cir. 2016) (quoting *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005)). That is, the evidence must be such that it "'can yield but one supportable conclusion.'" *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020) (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)). But although it is unfortunate and regrettable that Ms. Gardner's application has not reached finality even as years keep passing by, the error here is not that the ALJ failed to recognize the one-sided nature of Ms. Gardner's case. Rather, the ALJ short-circuited her duties by failing to address the medical opinions as the regulations require and stopped short of giving a proper subjective symptoms evaluation. At the same time, recognizing the circumstances in which Ms. Gardner has been placed, the Court hopes that the Agency can *expedite* the decision on remand.

### E.  Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: October 21, 2025

_____ /s/ JON E. DEGUILIO _____
Judge
United States District Court